UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 10-23507-CV-GOLD [LEAD CASE]

MICCOSUKEE TRIBE OF INDIANS
OF FLORIDA,

      Petitioner,

v.

UNITED STATES OF AMERICA,

      Respondent.

_____/

**ORDER GRANTING UNITED STATES' MOTION TO DENY PETITIONS TO
QUASH [ECF No. 16]; FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      THIS CAUSE is before the Court upon Respondent United States of America's
("Respondent" or "the Government") Motion to Deny Petitions to Quash ("Motion").
**[ECF No. 16]**.  Petitioner Miccosukee Tribe of Indians ("Petitioner" or "the Tribe") filed a
Response in opposition to the Motion ("Response").  **[ECF No. 33]**.  The Government
filed a Reply.  **[ECF No. 36]**.  On February 17, 2011, I held a one-day evidentiary
hearing **[ECF No. 39]** followed by the parties' closing arguments on February 18, 2011
**[ECF No. 42]**.  The parties submitted their respective Proposed Findings of Fact and
Conclusions of Law prior to the evidentiary hearing.  **[ECF Nos. 35, 37]**.

      Having carefully considered the parties' written submissions, witness testimony,
exhibits marked and admitted in evidence, applicable law, and being otherwise duly
advised, I GRANT the Motion for the reasons set forth below and make the following
findings of fact and conclusions of law.

# I.     FINDINGS OF FACT[1]

**A.     Procedural history**

**i.     Case No. 10-21332**

1.      On April 6, 2010, the Internal Revenue Service ("IRS") issued a Summons to Morgan Stanley Smith Barney ("Morgan Stanley") seeking production of records for accounts belonging to the Miccosukee Tribe of Indians of Florida (the "Tribe") for an investigation of the Tribe's former chairman.  **[ECF No. 1-3]**.[2]

2.      On April 26, 2010, the Tribe filed its Complaint/Petition to Quash the summons.  **[ECF No. 1]**.

3.      The Tribe objected to the summons on grounds of sovereign immunity, bad faith and improper purpose, overbreadth, and irrelevance.  *Id.*

4.      On June 21, 2010, the Government filed its Motion to Deny Petition to Quash.  **[ECF No. 15]**.

5.      On August 9, 2010, I heard oral argument on the motion.  **[ECF No. 22]**; *see also* **[ECF No. 30]**.

6.      On August 11, 2010, I issued an Order granting in part the Motion to Deny the Petition to Quash, rejecting the Tribe's sovereign immunity defense.  **[ECF No. 23]**; *see Miccosukee Tribe of Indians v. United States*, 730 F. Supp. 2d 1344 (S.D. Fla. 2010).

---

[1] To the extent factual findings appear under the "Conclusions of Law" heading or *vice versa*, the pertinent facts or conclusions shall be construed appropriately and shall not be constrained by the heading under which they appear.

[2] All Electronic Case Filing numbers in this section refer to Case No. 10-21332-CIV-GOLD ("Case No. 10-21332").

7.    I ordered a limited adversary hearing because the Tribe alleged bad faith, improper purpose, and the Government's purported possession of the information at issue—raising factual questions that could not be resolved on the papers.  *Id.*

8.    Following my August 11, 2010 Order denying the Tribe's defense of sovereign immunity, but prior to the August 20, 2010 limited adversary hearing, the parties reached a tentative confidential settlement agreement.  **[ECF No. 28]**.

9.    Accordingly, I cancelled the adversary hearing and administratively closed the case.  **[ECF No. 29]**.

10.    On October 8, 2010, the Tribe filed a Notice of Appeal, appealing my August 11, 2010 Order "on sovereign immunity grounds."  **[ECF No. 31]**.

11.    On October 25, 2010, the Tribe moved for me to withdraw and vacate the August 11, 2010 Order and provide a Rule 62.1 "indicative ruling" to that effect.  **[ECF No. 37]**.

12.    On November 18, 2010, I denied the Tribe's Motion to Vacate without prejudice, noting that newly consolidated and transferred civil cases, Case Nos. 10-23507, 10-23508, 10-23509, and 10-23511, involve similar subject matter and factual background as Case No. 10-21332.  **[ECF No. 39]**.

13.    On November 23, 2010, the Eleventh Circuit issued a jurisdictional question based on its review of Case No. 10-21332.  **[ECF No. 40]**.

14.    The Eleventh Circuit noted that it may lack jurisdiction over the appeal and requested that the parties provide written responses regarding the following jurisdictional question:

Whether the district court's denial of tribal sovereign immunity in its August 11, 2010, order is interlocutorily appealable where the Miccosukee Tribe asserted tribal sovereign immunity, not as immunity from suit, but, rather, as a defense to the enforcement of an IRS summons against a third party? 28 U.S.C. §§ 1291, 1292; *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 63 F.3d 1030, 1050 (11th Cir. 1995); *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949).

*Id.* at 3.

15.    The Tribe also filed a motion in the Eleventh Circuit requesting that the appeal be held in abeyance pending my order on the Tribe's Motion to Vacate the August 11, 2010 Order because according to the Tribe, there would be no need to pursue the appeal if I granted the Motion to Vacate.  **[ECF No. 37, pp. 8-9, fn. 8]**.

16.    On May 23, 2011, the Eleventh Circuit dismissed the appeal as moot in light of the parties' responses to the Eleventh Circuit's March 11, 2011 order to show cause why the appeal should not be dismissed as moot in light of the parties' apparent settlement.  **[ECF No. 51]**.

17.    Upon review of the responses, the Eleventh Circuit concluded that the appeal was moot because there was no longer any live case or controversy involving the summons which was the subject of the Tribe's motion to quash.  *Id.* at 2-3.

**ii.    Case Nos. 10-23507, 10-23508, 10-23509, and 10-23511**

18.    The IRS commenced its examination of the Tribe for the years 2006 through 2009 by researching IRS records to determine whether the Tribe filed 945 returns and what 1099 forms the Tribe filed.  Deposition of Revenue Agent James M. Furnas, January 12, 2011 ("Furnas Depo.") at 12:19-21.

19.     Based on Revenue Agent James M.  Furnas's ("Agent Furnas")[3] review of the records, he concluded "that it appeared that there was a significant possibility that all the 1099s that were required were not filed and that the Tribe may have a 945 filing requirement that had not been met."  Furnas Depo. at 12:21-13:4.

20.     On September 10, 2010, the IRS, through Agent Furnas, issued to Morgan Stanley a summons requiring that it produce certain tribal documents pertaining to the taxable periods ending December 31 for the years 2006 through 2009.  **[ECF No. 1-3]**.[4]

21.     Specifically, Morgan Stanley was directed to produce eight categories of documents "pertaining to the Miccosukee Tribe in any capacity, whether held jointly or severally, as trustee, fiduciary, custodian, executor, guardian and/or beneficiary."  *Id.*

22.     The summons to Morgan Stanley seeks the following records:

i.      Security transactions including all types of accounts, agreements, contracts, application for account, and signature cards. Records relating to treasury notes or certificates of deposit purchased, cash accounts, ready asset accounts, mutual fund accounts, commodity accounts, margin accounts, or other accounts. Such records include cash receipts, confirmation slips, securities delivered receipts, statements of account, notifications of purchase or sale, representative's stock record, account executive worksheets, correspondence, ledger sheets, cash in slips, buy and sell slips, or other records of these transactions.

ii.     Showing the dates, amounts, and purpose of all payments, including records showing a description of the securities transacted, quantity bought or sold, date of transactions, purchase or sales price, and commissions paid.

---

[3] As an Indian Tribal Government Specialist in the Indian Tribal Government Division of the IRS, Agent Furnas conducts civil tax examinations for the IRS.  **[ECF No. 38]** (Transcript of February 17, 2011 Evidentiary Hearing ("Tr.")) at 6:1-9.

[4] Unless otherwise indicated, all Electronic Case Filing numbers in this section refer to Case No. 10-23507-CIV-GOLD ("Case No. 10-23507").

iii.  Disposition of the proceeds from each sale of a security, including checks (front and back) issued to the above named individual(s) as a result of these sales.

iv.  Any and all dividends and/or interest paid to the Miccosukee Tribe, including checks (front and back) and Forms 1099 issued to the Miccosukee Tribe.

v.  Any other payments to the Miccosukee Tribe that show the date, amount, and purpose of the payment, including the checks (front and back) for such payments.

vi.  Maintained of transactions for or communications with the Miccosukee Tribe, including all notes, memoranda (informal or formal), correspondence, financial statements, background or credit investigations, and records identifying the stock transfer agent and dividend disbursing agent.

vii.  All checking accounts of the Miccosukee Tribe, including but not limited to signature cards, bank statements, deposit slips, checks deposited, checks drawn on the account, records pertaining to all debit and credit memos, transit items and Forms 1099 issued.

viii.  All credit and/or debit cards of the Miccosukee Tribe, including but not limited to application forms completed, signature cards, credit or background investigations conducted, correspondence, monthly billing statements, cash advances, transaction records, individual charge invoices, repayment records disclosing the dates, amounts and method (cash or check) of repayment and checks tendered to make repayments (front and back).

**[ECF No. 16-1]** (Declaration of James M. Furnas ("Furnas Dec.")) ¶ 12.[5]

23.  Also on September 10, 2010, Agent Furnas issued similar summonses to third-party tribal recordkeepers Citibank (South Dakota), N.A. ("Citibank") **[Case No. 10-23508; ECF No. 1-3]** ("Citibank Summons"), American Express Company ("American Express") **[Case No. 10-23509; ECF No. 1-3]** ("American Express Summons"), and Wachovia Bank ("Wachovia") **[Case No. 10-23511; ECF No. 1-3]**

---

[5] Agent Furnas' declaration was entered as direct testimony. *See* **[ECF No. 16-1]**; Tr. at 77:17-20.

("Wachovia Summons").  **[ECF No. 4-1]**.

24.     The summonses directed Citibank, American Express, and Wachovia to provide all of the following:

i.      Savings account documents, including but not limited to signature cards, ledger cards, records reflecting dates and amounts of deposits, withdrawals, interest, debit and credit memos, deposit slips, checks deposited, withdrawal slips, transit items, checks issued for withdrawals and Forms 1099 issued.

ii.     Checking account documents, including but not limited to signature cards, bank statements, deposit slips, checks deposited, checks drawn on the account, records pertaining to all debit and credit memos, transit items and Forms 1099 issued.

iii.    Loan documents, including but not limited to applications, financial statements, loan collateral agreements, credit and/or background investigations, loan agreements, notes, mortgages, settlement sheets, contracts, checks issued for loans, repayment records (including records revealing the date, amount and method of repayment, whether by cash or check), checks used to repay loans, documents reflecting the total amount of discount or interest paid annually, records of liens, loan correspondence files and internal bank memoranda.

iv.     Safe deposit box documents, including but not limited to contracts, access records, and records of rental fees paid (including those reflecting the date, amount, and method of payment, whether by cash or check).

v.      Certificate of Deposit documents, including but not limited to applications, actual Certificate of Deposit instruments(s), records of purchases, redemption's, checks issued on redemption, checks used to purchase Certificate, all correspondence regarding the Certificate(s), Forms 1099 issued, documents reflecting the annual interest paid and/or accumulated, the dates of payment and/or dates interest is earned, copies of checks issued for interest payments or deposits into account reflecting interest paid.

vi.     Money Market Certificate documents, including but not limited to applications, actual Money Market Certificate instruments(s), records of purchases, redemption's, checks issued on redemption, checks used to purchase Certificate, all correspondence regarding the Certificate(s), Forms 1099 issued, documents reflecting the annual interest paid and/or accumulated, the dates of payment and/or dates interest is earned, copies of checks issued for interest payments or deposits into account reflecting interest paid.

vii.    U.S. Treasury Notes and Bills, including but not limited to all documents reflecting the purchase of U.S. Treasury Bills and Notes and/or subsequent sale of such bills or notes, including interest paid, checks used for the purchase or sale of the notes and bills, Forms 1099 issued, checks issued for interest payments and all records of interest paid or accumulated (including those revealing the dates and amount of interest paid or accumulated).

viii.   Credit card records, including but not limited to application forms completed, signature cards, credit or background investigations conducted, correspondence, monthly billing statements, cash advances, transaction records, individual charge invoices, repayment records disclosing the dates, amounts and method (cash or check) of repayment and checks tendered to make repayments (front and back).

ix.     Documents reflecting the purchase of bank checks, cashier, teller, travelers' checks, certified checks and money order records. This request also includes the check register, file copies of the checks or money orders and records revealing the date and source of payment for said checks or money orders.

x.      Documents reflecting certified checks, wire transfers, collections, letters of credit, bonds and securities purchased, sold or otherwise transacted through each bank. This request also includes savings bond transactions and investment accounts and should include documents that disclose the date and amount of the transaction, method of transaction (i.e., whether by cash, check or electronic), source of payment, instruments used for payment and statements of transactions.

xi.     Documents reflecting correspondence or other communications regarding the Miccosukee Tribe.

Furnas Dec. ¶¶ 22, 32, 42.

25.     Agent Furnas testified that language in the summons issued to Morgan Stanley differs from the language of the summonses issued to Citibank, American Express and Wachovia because "Morgan Stanley is a brokerage. . . . and the type of records that you would request from would ask from a bank or a credit card company or just a financial institution."  Furnas Depo. at 83:2-9.

26.     In contrast to the prior summons at issue in Case No. 10-21332, which purported to seek only documents of an individual Tribal member, the September 10, 2010 summonses seek Tribal records regarding the internal financial operations of the Tribe.  **[ECF No. 33 at 1]**; *cf.* **[Case No. 10-21332; ECF No. 1-3]**.

27.     On September 29, 2010, pursuant to 26 U.S.C. § 7609(b)(2), the Tribe filed Petitions to Quash the Summonses issued to Morgan Stanley **[ECF No. 1]**, Citibank **[Case No. 10-23508; ECF No. 1]**, American Express **[Case No. 10-23509; ECF No. 1]** and Wachovia **[Case No. 10-23511; ECF No. 1]**.

28.     The Tribe requested transfers of four motions to quash because Case No. 10-21332 involved a similar proceeding regarding another Motion to Quash that was before the undersigned and administratively closed.  **[ECF No. 4]**.

29.     On October 15, 2010, I granted Petitioner's unopposed Motion to Transfer and Consolidate, consolidating civil Case Nos. 10-23507, 10-23508, 10-23509, and 10-23511 and ordering the parties to file all pleadings in the first-filed Lead Case No. 10-23507 (Morgan Stanley).  **[ECF No. 8]**.

30.     Case Nos. 10-23508 (Citibank (South Dakota), N.A.), 10-23509 (American Express Company), and 10-23511 (Wachovia Bank) are closed.  *Id.*

31.     Each of the four motions to quash mentions my prior order in Case No. 10-21332 in a footnote to support the Tribe's contention that "[a] United States agency or agent cannot, as the IRS seeks to do here, unilaterally abrogate tribal immunity without statutory authority."  *See e.g.*, **[ECF No. 1, p. 4, fn. 2]**.

32.     The footnote expressly indicates that I rejected the Tribe's claim of immunity with respect to records involving the Tribe's former chairman.  *Id.*

33.     On November 12, 2010, I held an in-person status conference during which the parties discussed their willingness to meet and confer regarding the issues in the Petitions to Quash.  **[ECF No. 11]**.

34.     Following the status conference, on November 18, 2010, I issued an order requiring Petitioner to file a Status Report regarding the parties' discussions.  **[ECF No. 13]**.

35.     In the event that the parties could not reach an agreement, I required the Tribe to file a Motion to Request Discovery, specifically outlining what discovery is necessary, whether an evidentiary hearing is necessary, the scope of any such discovery and/or hearing, and the reasons for any proposed discovery and/or hearing. *Id.*

36.     I also ordered Respondent to file a response to the Petitions.  *Id.*

37.     On December 15, 2010, the Tribe filed a Status Report indicating that the parties did not reach an agreement.  **[ECF No. 15]**.

38.     The Tribe's position is that the summonses are improper because they issue seek production of all records for financial accounts belonging to the entire Miccosukee Tribe of Indians of Florida.  *Id.* ¶3.

39.     The Tribe's Status Report indicated that it would renew the sovereign immunity defense argued in the prior Case No. 10-21332.  *Id.*

40.     Since the parties did not reach an agreement with respect to the summonses and motions to quash, on December 15, 2010, the Government filed a Motion to Deny Petitions to Quash.  **[ECF No. 16]**.

41.     In support of the US' Motion to Deny Petitions to Quash, the Government filed a Declaration of Revenue Agent James M.  Furnas ("Furnas Dec.") setting forth the content of the summonses, as well as Agent Furnas's experience regarding prior IRS investigations involving the Tribe.  **[ECF No. 16-1]**.

42.     In his Declaration, Agent Furnas states:  "In 2005, the IRS learned that the Tribe regularly distributed payments to tribal members without reporting these distributions to the IRS."  **[ECF No. 16-1 ¶ 4]**.

43.     Based on this information, the IRS conducted an examination to determine whether the Tribe met its reporting and withholding requirements for the years 2000 through 2005.   *Id.*  ¶ 5;  *see also*  **[ECF No. 38]** (Transcript of February 17, 2011 Evidentiary Hearing ("Tr.")) at 8:18-9:4.

44.     Furthermore, Agent Furnas's Declaration states that "[t]he IRS believes that similar payments were made by the Tribe for 2006, 2007, 2008, and 2009 and that the Tribe did not withhold from or report the payments as required."  **[ECF No. 16-1 ¶ 6]**;  *see also* Furnas Depo. at 16:15-17:6; 103:9-14.

45.     On the same day that Respondent filed its Motion to Deny Petitions to Quash, the Tribe filed a Motion to Request Discovery, requesting a limited adversary evidentiary hearing and limited discovery to obtain information relating to the issues of the Government's alleged improper purpose and bad faith in relation to the summonses. **[ECF No. 17]**.

46.     On December 22, 2010, I held a telephonic status conference during which it was determined that the parties would file responses and replies to the pending motions.  **[ECF No. 22]**.

47.     In an Order Following Status Conference, a Discovery Conference before U.S. Magistrate Judge Chris M. McAliley was set.  **[ECF No. 21 ¶ 1]**.

48.     On January 10, 2011, Judge McAliley held a Discovery Conference regarding the scope of discovery in this matter.  **[ECF No. 29]**.

49.     On January 11, 2011, Judge McAliley issued an Order Following Hearing and permitted the Tribe to depose Agent Furnas for three hours, but did not permit any written discovery.  **[ECF No. 30]**.

50.     Agent Furnas was deposed for approximately three hours on January 12, 2011. **[ECF No. 33-1]**.

**B.     Factual background**

51.     The IRS is examining whether the Tribe met its withholding and reporting obligations for the 2006 through 2009 tax periods.  Tr. at 55:4-9.

52.     The IRS's examination of the Tribe arose from allegations that the Tribe was making unreported distributions to tribal members.  Furnas Dec. ¶ 4.

53.    The Tribe has not specifically disputed in any of its filings that it made unreported distributions to Tribal members.  *See, e.g.,* **[ECF No. 33]**.

54.    Prior to this examination, the IRS examined whether the Tribe met reporting and withholding obligations for the 2000 through 2005 tax years ("2000-2005 investigation").  Furnas Dec. ¶ 4.

55.    In the 2000-2005 investigation, the IRS discovered that the Tribe failed to make required withholding on certain taxable payments of American Indian casino profits under 26 U.S.C. § 3402(r) and backup withholding under 26 U.S.C. § 3406, in addition to failing to file Forms 945, Annual Return of Withheld Federal Income Tax, for that withholding.  *Id.*

56.    The IRS also determined that several Forms 1099 MISC, Miscellaneous Income, were not filed as required to report payments to members as well as payments of non-employee compensation to service providers.  *Id.* ¶ 5.[6]

57.    The IRS believes there could have been 1099 miscellaneous forms required for three basic types of transactions, where:  (1) the Tribe distributed income to members from the gross receipts tax; (2) the Tribe distributed income to members from net gaming revenue (requiring withholding under Section 3402(r)); and (3) payments to

---

[6] Under the examination of prior years, Agent Furnas asserted penalties under Sections 6721(e) and 6722 for normal penalties under 1099 for failure to file and intentional disregard penalties.  Tr. at 60:11-19.  In determining that there was a willful failure to file the 1099 forms or that the required information returns were not filed, and in asserting penalties, the IRS examined evidence that the Tribe made payments from the gross receipts tax, but also from net gaming, to third-party subcontractors.  *Id.* at 60:7-11.  The IRS examined "the history of filings, the magnitude of the noncompliance, [and] any advice that has been shown to have been received[.]"  *Id.* at 60:12-14.  The intentional disregard penalty with regard to information returns is ten percent for failure to file, ten percent of the payments, and ten percent of the failure to furnish, while the penalty for failure to file where there is not intentional disregard is $50 per return.  *Id.* at 63:9-15.

service providers (which may requiring withholding under Section 3406 if the Tribe did not obtain tax identification numbers from members).  Tr. at 79:8-16; 79:18-80:3.

58.    Believing that the Tribe continued to make similar payments without properly withholding from or reporting them, the IRS began investigating the Tribe for the 2006, 2007, 2008, and 2009 tax periods.  Furnas Dec. ¶ 6.

59.    Agent Furnas has not received any documentary evidence or testimony under oath from the Tribe for the audit for years 2006 through 2009, despite requesting documents from the Tribe apart from the summonses at issue in this case.  Tr. at 71:1-6; 80:10-13; 80:20-25.

60.    For the 2000-2005 investigation, the Tribe provided a list of gross distributions, but Agent Furnas had to reconstruct the check registers to determine payments to service providers and distributions from the general account; Agent Furnas had to develop most of the information from third-party records.  Id. at 71:21-72:2.

C.    **Parties' positions**

i.    **Tribe**

61.    The Tribe renews its sovereign tribal immunity argument from the prior case involving the Tribe's chairman, arguing that "[i]t is inconsistent with constitutional separation of powers principles, with Supreme Court precedent, and with the tribal immunity doctrine to permit a United States agency or agent to unilaterally abrogate tribal immunity where Congress has not done so."  **[ECF No. 33, p. 3]**.

62.    Notably, the Tribe claims it is not responsible for withholding or reporting the funds which the IRS seeks to tax as income to individual tribal members.  Id. at 4.

63.   Accordingly, it is the Tribe's position that the IRS has no basis for investigating the Tribe because there are no withholding or reporting requirements for the tribal distributions at issue.  *Id.*

64.   However, the Tribe concedes that the taxability of these distributions is "currently being contested at the administrative level," *e.g.*, on appeal internally within the IRS.  *Id.*

65.   One of the Tribe's positions is that distributions from the NTDR[7] account are from a gross receipts tax and qualify for the doctrine of distributions from the land to tribal Indian members.  Tr. at 55:14-23.[8]

   ii.   **IRS**

66.   The IRS moves to dismiss the petitions to quash with respect to the sovereign immunity issue on the grounds that tribal sovereign immunity does not bar actions by the United States and that sovereign immunity does not extend to third-party recordkeepers such as the banks at issue in this case.  **[ECF No. 16, pp. 13-15]**.

---

[7]  When asked what the initials "NTDR" stand for, Agent Furnas testified at the evidentiary hearing that other tribes use those initials which usually stand for "nontaxable distributions," but he was not specifically informed what "NTDR" stood for in this case.  Tr. at 61:24-62:3.

[8]  Agent Furnas testified at the evidentiary hearing that he is "convinced that [the Tribe's] position does not have any merit, that it does not meet the criteria of the type of revenues that can be distributed to tax members without it being taxable income to those members."  Tr. at 56:15-20.  In the prior audits, Agent Furnas also found hundreds of payments to subcontractors for which 1099 forms were required and not filed, as well as distributions to tribal members in prior years that were "pretty clearly funded by net gaming revenues."  *Id.* at 56:21-57:4.

67.     Though income from the land under certain specific circumstances may be able to be distributed to tribal members without becoming taxable income and requiring a 1099 form, Agent Furnas's review and examination of payments from the Tribe found that none of the payments qualify under that doctrine.  Tr. at 64:13-25.

68.     According to Agent Furnas, even if all distributions from the gross receipts tax were non-taxable and did not require a 1099 form, Agent Furnas would still require all the requested records to determine amounts from net gaming revenues and amounts paid to third-party service providers that may require 1099 forms because he found substantial distributions from the general account funded by net gaming revenues, as well as hundreds of payments to third-party service providers for which 1099 forms were not filed, and the Tribe has not provided an explanation for these actions.  *Id.* at 65:18-66:12; *see id.* at 66:13-17.

## II.     <u>CONCLUSIONS OF LAW</u>

**A.     Administrative summonses**

1.     Section 7602(a) of the Internal Revenue Code authorizes the IRS to issue an administrative summons for "determining the liability of any person for any internal revenue tax . . ."

2.     Specifically, Section 7602(a), in relevant part, authorizes the IRS:

(1)     To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2)     To summon . . .

any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary [of the Treasury] may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers,

records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry.

3.      To enforce an IRS summons, the Government has the burden—albeit minimal—to demonstrate the following:

(1)      the investigation will be conducted pursuant to a <u>legitimate purpose</u>
(2)      the inquiry may be <u>relevant</u> to the purpose,
(3)      the information sought is <u>not already within the Commissioner's possession</u>, and
(4)      the <u>administrative steps</u> required by the Code have been followed.

*United States v. Powell*, 379 U.S. 48, 57-58 (1964) (emphasis added).  *See also United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 318 (1978); 26 U.S.C. § 7609(b)(2)(A); S. Rep. No. 97-494, 97th Cong., 2d Sess., Vol. I p. 283 (1982).

4.      The Government may demonstrate this burden through an affidavit or sworn declaration of the IRS officer who issued the summons.  *See e.g., In re Newton*, 718 F.2d 1015, 1019 (11th Cir. 1983).

5.      The Tribe bears the burden to rebut the United States' *prima facie* case that the *Powell* requirements have been met or to prove that enforcement would be an abuse of the Court's process.  *See Powell*, 379 U.S. at 58.

6.      As a preliminary matter, and as discussed further *infra*, I find that:  the Tribe is not entitled to a sovereign immunity defense in the instant circumstances; the Government has met its burden to demonstrate that it has met all four prongs required under a *Powell* analysis through, *inter alia*, the declaration of Agent Furnas **[ECF No. 16-1]**; and the Tribe has not rebutted the Government's *prima facie* case—thereby warranting denial of the motions to quash.

**B.      Sovereign immunity**

7.      I address the Tribe's claim of sovereign immunity as a threshold issue because if tribal sovereign immunity applies, then there is no need to perform the *Powell* analysis to determine whether the IRS properly issued the administrative summons.

8.      In essence, the Tribe seeks reconsideration of portions of my prior order dealing with the tribal sovereign immunity issues, *Miccosukee*, 730 F. Supp. 2d 1344, and urges me to determine that the Tribe is entitled to claim sovereign immunity in this case and should have been permitted to quash the summons in Case No. 10-21332 on similar grounds.

9.      For the reasons discussed *infra*, I remain consistent with the determinations in my prior order and find that the Tribe is not entitled to raise tribal sovereign immunity to quash the summonses at issue in this case.

10.      "The doctrine of sovereign immunity encompasses all actions brought against the United States, including those against federal officers and actors, in which the relief 'sought would expend itself on the public treasury or domain, or interfere with the public administration . . . or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *United States v. Kaufman*, 980 F. Supp. 1247, 1250 (S.D. Fla. 1997) (citing *Dugan v. Rank*, 372 U.S. 609, 620, 83 S. Ct. 999, 1006 (1963)).

11.      Tribes retain sovereign immunity in accordance with the principles of federal common law. *Kiowa Tribe v. Mfg. Tech., Inc.*, 523 U.S. 751, 754, 759 (1998).

12.     Where applicable, tribal sovereign immunity bars actions against tribes regardless of the type of relief sought.  *Freemanville Water Sys. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1208 (11th Cir. 2009) (citing *Kiowa Tribe*, 523 U.S. at 760 (barring suit for money damages); *Fla. Paraplegic Assoc'n v. Miccosukee Tribe of Indians*, 166 F.3d 1126, 1127 (11th Cir. 1999) (barring suit for injunctive relief)).

13.     As stated in my prior order on the motion to quash in Case No. 10-21332, *Miccosukee*, 730 F. Supp. 2d 1344, which I expressly incorporate herein, "[t]ribal sovereign immunity does not bar suits by the United States" and cannot be invoked "to prevent the federal government from exercising its superior sovereign powers."  *Florida Paraplegic*, 166 F.3d at 1135  (citations omitted).

14.     Congress can abrogate sovereign immunity by authorizing a suit, or a tribe can waive its immunity.  *See Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1241 n.5 (11th Cir. 1999) ("We believe that it is most conducive to reasoned analysis to have separate terms for a congressional deprivation of tribal sovereign immunity as distinguished from a voluntary tribal relinquishment thereof.  In this opinion, therefore, we refer to the former as a congressional abrogation of immunity and to the latter as a tribal waiver of immunity.").

15.     "When Congress intends to abrogate tribal sovereign immunity, it must do so expressly, with clear and unequivocal language."  *Freemanville*, 563 F.3d at 1208 (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. at 58-59; *Seminole Tribe*, 181 F.3d at 1241-42).

16.     The Tribe is a federally recognized Indian Tribe that exercises powers of self-governance under a tribal Constitution approved by the Secretary of the Interior, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 476.  **[ECF No. 1 at 3]**.

17.     Like the prior Case No. 10-21332 and *United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380, 382 (8th Cir. 1987), the Tribe invokes tribal sovereign immunity in the instant matter in an attempt to limit the ability of the United States to retrieve those records for its investigation.

18.     The Tribe contends these are tribal records and therefore subject to tribal sovereign immunity.  *See generally* **[ECF No. 1, p. 3 ¶ 5(a)]**.

19.     However, this argument faces the same critical flaws that the Tribe advanced in its earlier argument in Case No. 10-21332—tribal sovereign immunity may not be asserted against the United States and even if the Tribe could assert tribal sovereign immunity against the United States, such immunity would be inapplicable here because the instant matter is not a suit against the sovereign.

20.     In contrast to the prior summons at issue in Case No. 10-21332, which purported to seek only documents of an individual Tribal member, the September 10, 2010 summonses seek Tribal records regarding the internal financial operations of the Tribe.  **[ECF No. 33 at 1]**; *cf.* **[Case No. 10-21332; ECF No. 1-3]**.

21.     However, the fact that this investigation does not relate to a specific tribal member such as the Tribe's chairperson does not make the Tribe's sovereign immunity more persuasive in this context and I find that this difference between the two investigations does not have significant bearing upon my analysis of the sovereign immunity issue.

22.     As in the prior case, the United States seeks records from third-party recordkeepers, and any sovereign immunity the Tribe can claim must necessarily defer to the superior sovereign power, *e.g.*, that of the United States.  *See Fla. Paraplegic*, 166 F.3d at 1135.

23.     I reiterate my concerns about invoking tribal sovereign immunity in the instant situation where the summons seeks documents from the Tribe's third-party recordkeeper.  *See Miccosukee*, 730 F. Supp. 2d at 1349 (noting that "this does not appear to be a 'suit [] against the sovereign.'") (citing *Dugan*, 372 U.S. at 620).

24.     As the IRS notes, the summonses seek information within the custody and control of the third-party recordkeeper banks.

25.     Though these records fall within the control of third parties, the Tribe urges me to consider them as tribal records because they are sensitive material pertaining to unnamed tribal members.  *See e.g.*, **[ECF No. 1, pp. 21-22]**.

26.     I do not find persuasive the Tribe's argument that "[t]he Summonses are clearly acts against the sovereign because they compel production of the Tribe's financial information in connection with a direct investigation of the Tribe, and force the Tribe to take measures to protect its privacy and sovereignty."  **[ECF No. 37 ¶ 30]**.

27.     As Agent Furnas testified at the evidentiary hearing, he has no authority to tell the Tribe how to collect or distribute revenue, nor is he making any attempt to do so. Tr. at 81:24-25.

28.     The authority that the IRS possesses in regard to this investigation is merely to instruct the Tribe on any reporting and withholding requirements.  *Id.* at 82:1-3.

21

29.     While the Tribe cites a number of cases in which courts determined that sovereign immunity led to granting motions to quash, these cases are not controlling because they fall outside of this Circuit and/or they are distinguishable.  *See e.g.*, *Catskill Dev., LLC v. Park Place Entm't Corp.*, 206 F.R.D. 78, 81 (S.D.N.Y. 2002) (finding that magistrate judge did not err in determining that Native American tribe members may not be compelled to testify or produce documents as non-party fact witnesses pursuant to the district courts' subpoena power in civil suit); *see id.* at 93 (noting "this is not a prosecutorial investigation — it is a civil lawsuit.").

30.     Because I conclude that the Tribe cannot claim tribal sovereign immunity to quash the summonses, I must now examine the four *Powell* factors to determine whether the summonses may be quashed on those grounds, *i.e.*, if the Government has met its burden under the four factors and if the Tribe has met its burden to rebut the United States' *prima facie* case.

## C.     Legitimate purpose

31.     An administrative summons must be issued "in good-faith pursuit of the congressionally authorized purposes of § 7602."  *LaSalle Nat'l Bank*, 437 U.S. at 318.

32.     Section 7602 authorizes the IRS to issue a summons to require a person[9] to produce books, papers, records, or other data and records or to give testimony in: (1) ascertaining the correctness of any return; (2) making a return where none has been made; (3) determining or collecting the liability of any person for any internal revenue

---

[9] As noted in 26 U.S.C. § 7602(b), the IRS may "summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper[.]"

tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax; or (4) inquiring into any offense connected with the administration or enforcement of the internal revenue laws.  26 U.S.C. §§ 7602(a)-(b); 26 C.F.R. § 301.7602-1(a).

33.    The Supreme Court recognized in *Powell* that "an abuse would take place if the [IRS] summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation."  379 U.S. at 58.

34.    In *Powell*, the Supreme Court also noted that the act of the IRS issuing a summons to investigate is akin to other agencies' actions where they may institute an investigation "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not."  379 U.S. at 57 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950)).

35.    There is no requirement that the IRS demonstrate probable cause prior to issuing a summons or in order to enforce the summons.  *Powell*, 379 U.S. at 57 ("the Commissioner need not meet any standard of probable cause to obtain enforcement of his summons, either before or after the three-year statute of limitations on ordinary tax liabilities has expired.").

36.    The general authority for investigating whether taxpayers have complied with the applicable requirements of the Internal Revenue Code is found in 26 U.S.C. § 7601(a), which provides:

General rule. The Secretary shall, to the extent he deems it practicable, cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax, and all persons owning or having the care and management of any objects with respect to which any tax is imposed.

26 U.S.C. § 7601(a).

37.    The Supreme Court "has consistently construed congressional intent to require that if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities to enforce the tax Code, that authority should be upheld absent express statutory prohibition or substantial countervailing policies."  *United States v. Euge*, 444 U.S. 707, 711 (1980) (reversing judgment of Eighth Circuit Court of Appeals refusing enforcement of a summons requiring a taxpayer to appear and execute handwriting exemplars under Section 7602).

38.    Withholding requirements under 26 U.S.C. § 3402(r) expressly apply to "every person, including an Indian tribe."  26 U.S.C. § 3402(r)(1).

39.    The IRS also points to 26 U.S.C. § 6041 as an example of a statute requiring an information return, suggesting that this applies to Indian tribes.  *See* 26 U.S.C. § 6041(a) ("All persons engaged in a trade or business and making payment in the course of such trade or business to another person . . . of $ 600 or more in any taxable year, . . . shall render a true and accurate return to the Secretary . . . setting forth the amount of such gains, profits, and income, and the name and address of the recipient of such payment.").

40.     Indeed, in a Treasury Determination revenue ruling,[10] it was determined that Indian tribal governments that operate bingo establishments are subject to information reporting requirements of 26 U.S.C. § 6041.  Rev. Rul. 85-194, 1985-2 C.B. 301 (citing *United States v. Haimowitz*, 404 F.2d 38 (2d Cir. 1968) (per curiam) and S. Rep. No. 103, 65th Cong., 1st Sess. 20 (1917), 1939-1 (Part 2) C.B. 56, 67 for the proposition that "[t]he purpose of section 6041 of the Code is to help the federal government locate recipients of income and ascertain amounts they receive.").

41.     The revenue ruling concluded that since the Indian tribe was in the trade or business of operating a bingo facility and, in the course of that trade or business, made payments of winnings of $1,200 from time to time, application of Section 6041 to the Indian tribe furthers the purpose of section 6041 to locate recipients of income. Rev. Rul. 85-194, 1985-2 C.B. 301.

42.     The ruling also noted that the term "person," as defined in Section 7701(a)(1) of the Internal Revenue Code, "is sufficiently broad to include a governmental body."  *Id.* (citing *Ohio v. Helvering*, 292 U.S. 360 (1934), *overruled on other grounds in Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 542 (1985)

---

[10] For purposes of providing additional background information, and because the IRS is investigating whether the Tribe properly reported and withheld requirements under the Internal Revenue Code, I include this revenue ruling to the extent that it assists in interpreting portions of the Code.  *See Stubbs, Overbeck & Assocs. v. United States*, 445 F.2d 1142, 1146-1147 (5th Cir. 1971) ("Though a revenue "ruling is merely the opinion of a lawyer in the agency and must be accepted as such.  It may be helpful in interpreting a statute, but it is not binding on the Secretary or the courts.  It does not have the effect of a regulation or a Treasury Decision.") (internal citations omitted).

All cases decided by the United States Court of Appeals for the Fifth Circuit before September 30, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

and 1934-1 C.B. 531 (1934), XIII-1 C.B. 531 (1934)).[11]

43.     Specifically with respect to Indian tribes, the Supreme Court has stated that "the canon that assumes Congress intends its statutes to benefit the tribes is offset by the canon that warns us against interpreting federal statutes as providing tax exemptions unless those exemptions are clearly expressed." *Chickasaw Nation v. United States*, 534 U.S. 84, 89, 95 (2001) (holding that the Indian Gaming Regulatory Act did not create an exemption from gambling-related taxes imposed upon the tribes under Chapter 35 of the Internal Revenue Code) (citations omitted).

44.     Therefore, at this juncture, the IRS need not prove that the Tribe actually failed to properly withhold taxes and report payments.

45.     As detailed *supra*, the IRS believes from its prior investigations that the Tribe failed to properly withhold from and report payments to Tribal members and others.

46.     Although it is the Tribe's position that there is no federal withholding or reporting requirement and the IRS has no proper basis for investigating the Tribe (*see* **[ECF No. 37, p. 19 fn. 23]**), this argument is belied by the statements of Agent Furnas in his declaration, deposition, and sworn testimony at the evidentiary hearing.

---

[11] *See also Chickasaw Nation v. United States*, 208 F.3d 871, 880 (10th Cir. 2000), *aff'd, on other grounds* 534 U.S. 84 (2001) ("conclud[ing] that Congress unambiguously intended for the word 'person,' as used in § 7701(a)(1), to encompass all legal entities, including Indian tribes and tribal organizations . . . ." and "emphasiz[ing] that were we to conclude that Indian tribes and tribal organizations are excluded from § 7701(a)(1)'s definition of "person," we would essentially exempt tribes and tribal organizations from many forms of federal tax liability and render entire sections of the IRC superfluous.").

47.     As Agent Furnas explained, and as evident from the evidence presented, the IRS is in initial stages of its investigation of the years 2006-2009 and does not possess, let alone know of the existence of, the materials it seeks in the summons.

48.     The IRS issued the summonses to the Tribe's third-party recordkeepers for an administrative examination as to whether the Tribe: (a) failed to "withhold taxes from certain payments of American Indian casino profits" pursuant to 26 U.S.C. 3402(r); (b) failed to backup withhold under 26 U.S.C. § 3406, to the extent the Tribe did not possess a payee's tax identification number prior to the Tribe making a payment and for non-employee compensation; (c) failed to report on Form 945 backup withholding or withholding on certain payments of American Indian casino profits; and, (d) failed to file information returns "including Form 1099-MISC for payments made in the course of its trades or businesses" in excess of $600.  **[ECF No. 16 at 9]**.

49.     Section 3402(r) specifically requires the withholding when the Tribe distributes net gaming revenues to tribal members.  Tr. at 57:13-14; 59:2-3.

50.     The distribution and withholding are reported to the IRS and the tribal member on a 1099 form and the withholding is reported on a 945 form.  *Id.* at 59:3-6.

51.     If there was reporting under Section 3402(r), net revenues from gaming when distributed would be considered taxable income to the tribal members under Internal Revenue Code Section 61.  *Id.* at 59:9-15.

52.     Though it is not the purpose of the instant summons, whether tribal members reported the income could lead to future information which would be important to the IRS regarding individual tribal members.  *Id.* at 59:16-60:7.

53.     The IRS's position is that the 1099 requirements apply regardless of whether the withholding requirements apply pursuant to Section 61 of the Internal Revenue Code because there is no exception that applies to the general rule that income received by individuals is includable in gross income.  *Id.* at 57:24-58:9.

### i.     The IRS's investigation

54.     The IRS conducted a review of distributions to tribal members from the NTDR account to determine the 1099 forms that the Tribe should have filed with regard to those distributions.  Tr. at 13:5-7.

55.     As a result of the IRS investigation, it determined that several 1099 forms were not filed with regard to those distributions.  *Id.* at 13:7-9.

56.     The 1099 forms would indicate taxable income to the individuals who received those distributions.  *Id.* at 13:9-10.

57.     The IRS's investigation for the previous years found several payments by the Tribe both to members as well as third-party service providers that required filing 1099s under Internal Revenue Code § 6041.  *Id.* at 24:9-12; *see also* Furnas Depo. at 15:1-8 (Agent Furnas believes "the Tribe is subject to information reporting requirements under Internal Revenue Code 6041, which is information return reporting," and "potentially subject to backup withholding under Internal Revenue Code 3406. . . . and withholding on certain payments or net gaming revenues to Tribal members under Code Section 3402(r).").

58.     Several of those payments were also subject to withholding, either under Section 3406, backup holding, or 3402(r) which is withholding on distributions of net profits from tribal casinos to the members.  Tr. at 24:12-15.

59.    Accordingly, the IRS was concerned that not only did the Tribe have an employer-employee relationship with those members who received distributions, but the IRS also investigated whether there was backup withholding or proper documentation as to net revenues from gambling when distributed to tribal members and third-party service providers such as attorneys, plumbers, and individuals performing construction—which required filing 1099 forms.  *Id.* at 24:17-25:3.[12]

60.    Agent Furnas's declaration states that "[t]he IRS commenced the Tribe examination in 2005, upon learning of allegations that the Tribe regularly hired armored cars to carry cash, somewhere between 6 and $10 million per quarter, from its gambling operation for direct distribution to tribal members without reporting these distributions to the IRS."  Furnas Dec. ¶ 4.

61.    The source of this allegation was a confidential informant.  Tr. at 20:22-21:9.

62.    Agent Furnas agreed at the evidentiary hearing that his belief was that profits generated from the casino were directly distributed in cash to tribal members or put into specific accounts for tribal members with any of the third parties who were subpoenaed.  Tr. at 23:3-9.

63.    The first step of the IRS's investigation is to determine what payments were made and whether they required 1099s.  *Id.* at 23:18-19.

---

[12] There is no issue of whether the Tribe had to file a gift tax return or something similar. Tr. at 25:4-6.   Due to the relationship of the Tribe to its members, the IRS has consistently taken the position that amounts paid from the Tribe to members are not gifts.  *Id.* at 75:16-22.  Further, generally, the payments the IRS is concerned about involve 1099 payments which by definition do not include an employer-employee relationship.  *Id.* at 75:2-4.

64.     Based on the prior years, the IRS found that monies from the casino went to a tribal account, were then delivered by armored car back to the casino which is on the reservation and then from there taken in SUVs further out to the reservation and distributed to tribal members.  *Id.* at 23:19-24.

65.     Agent Furnas agreed at the evidentiary hearing that the legitimate purpose of the investigation is to determine whether proper documents, such as the 1099 forms and the 945 forms, were filed.   *Id.* at 25:9-13; *see also* Furnas Depo. at 12:1-8 (objective of examination is "to determine whether the Tribe complied with the reporting and withholding requirements of the Internal Revenue Code to include information return reporting, whether the Tribe met its withholding requirements for the periods, and whether those withholding requirements would require the filing of Form 945, Annual Reported Withholding.").

66.     As Agent Furnas explained at the evidentiary hearing, the filing of 1099 forms does not require an employer-employee relationship, but is triggered when payments are made of taxable income to individuals of over $600 in a calendar year. Tr. at 25:23-26:1.

67.     Then, depending on the source of revenue, *i.e.*, if the distributions are from net revenues from gaming, then there is a special withholding requirement under 3402(r).  *Id.* at 26:1-3.

68.     Though the focus of the IRS investigation is to determine the Tribe's requirements to file 1099s and withhold on payments, as to the tribal members, if these monies went into the NTDR account for tribal members and earned interest, then there is an issue of whether the members properly reported the interest.  *Id.* at 26:4-8.

69.     Though the Tribe is not subject to income taxes as an entity, the Tribe may be subject to withholding taxes.  *Id.* at 26:14-21; Furnas Depo. at 19:16-17 ("The Tribe is not subject to federal income tax."); *see also* Rev. Rul. 67-284, 1967 WL 14945 (stating that an Indian tribe is not a taxable entity); Internal Revenue Manual 4.88.1.4 (2010) ("Indian tribes are not entities subject to federal income tax because they are not included in IRC section 1 (individuals, trusts and estates) or IRC section 11 (corporations)".).

70.     As to the scope of the investigation for the 2006-2009 years, Agent Furnas testified at the evidentiary hearing that the basic question to determine the 1099 requirement is whether there was a transfer of taxable income from the Tribe to an individual member.  Tr. at 27:10-17.

71.     To determine whether there was such a transfer, it is necessary to determine whether the individual member could be taxed based on what he or she received.  *Id.* at 17-19.

72.     Thus, the investigation could require examining transactions in accounts held on behalf of tribal members.  *Id.* at 27:21-22.

73.     Regarding the armored car allegations, Agent Furnas determined that the Tribe distributed cash to tribal members, the armored car went to the reservation as far as the casino, and Agent Furnas eventually learned that from there it was taken in SUVs with armed police escorts to the reservation and distributed to tribal members.  *Id.* at 29:7-13.

### ii.    Statute of limitations

74.    With respect to 1099 forms that were filed and incorrect, there is a three-year statute of limitations for the penalties from the date of filing of the 1099 form. *Id.* at 15:18-20; 53:6-11; *see also id.* at 73:4-14; 92:10-15.

75.    Agent Furnas testified during the evidentiary hearing that even if the statute of limitations was extended, his position would be that the IRS should continue to take timely actions on the case because there would be no good reason to delay and the need for completing work promptly. *Id.* at 18:16-22.

76.    Postponing the investigation would affect taxability of the distributions to tribal members, potentially allowing the statute of limitations on collection or assessment to run as to the tribal members themselves. *Id.* at 73:15-22.

77.    If the IRS identifies other taxpayers who received amounts that were not reporter, then it is the IRS's duty to see that those other taxpayers paid the applicable taxes and the statute of limitations for tribal members that filed returns would be three years from the date of filing or six years if there was a 25 percent or more omission of income. *Id.* at 73:24-74:5.

78.    Thus, if a tribal member reported some income, but did not report distributions from the Tribe, the statute of limitations would run on that year's return. *Id.* at 74:10-13.

79.    According to Agent Furnas, the Tribe transported large amounts of currency to the reservation, wherein tribal members would line up, receive checks, cash their checks on the spot, and walk away with cash. *Id.* at 76:13-21.

80.     Accordingly, the Tribe cashed many of the checks itself and this was the usual course of conduct based on Agent Furnas's understanding.  *Id.* at 76:22-77:1.

81.     Further, many payments constituted purchases of merchandise and payments of various expenses on behalf of tribal members and Agent Furnas disagreed that virtually all distributions were made by check.  *Id.* at 37:21-25.

82.     Regardless of the manner of distribution, *e.g.*, if the Tribe distributed cash versus providing members a check which was immediately cashed, or if a member cashed a check to his or her own bank account, the emphasis of the IRS investigation is whether the Tribe correctly reported the distribution.  *Id.* at 38:21-39:4.

**iii.    No improper purpose**

83.     The Tribe's argument that "the Government's actions here have been aimed at harassing and maligning the Tribe to force it to submit to the Government's improper demands" is not persuasive.  *See* **[ECF No. 37 ¶ 54]**.

84.     Agent Furnas characterized the processes of IRS investigations as first developing the facts, then arriving at the conclusions, agreeing that the documents are necessary to determine whether the IRS can arrive at the ultimate conclusion.  Tr. at 65:18-67:8.

85.     Agent Furnas has "not concluded for the years in question that [the Tribe] did not meet their 1099 requirements or that they are required to file 945, because [he has] not seen any of the information necessary to make those conclusions."  Furnas Depo. at 15:16-21.

86.     As Agent Furnas explained at the evidentiary hearing, he has not made any conclusion on how the law applies because he cannot do so until he reviews the evidence and documents, which is required in his investigation.  Tr. at 82:24-83:11.

### 1.     Safe deposit boxes

87.     Agent Furnas believes that contents of safe deposit boxes could lead him to evidence regarding determinations he must make in his investigation.  *Id.* at 85:5-7.

88.     For example, items could lead Agent Furnas to the nature of disbursements made based on Agent Furnas's discovery from prior years that the Tribe holds assets on behalf of the members and many members can choose whether to take their distribution or have the Tribe invest it for them.  *Id.* at 85:13-19.

89.     The summonses require that the banks "provide all safe deposit box documents, including but not limited to contracts, access records and records of rental fees paid, including those reflecting the date, amount and method of payment whether by cash or check."  *Id.* at 91:4-8.

90.     Accordingly, the summonses do not permit the IRS to enter the safe deposit boxes and the summonses seek documents relating to the boxes, as opposed to contents of the boxes.  *Id.* at 91:9-13.

91.     Agent Furnas believes he would probably have to issue a new summons—subject to the Court's review—to examine contents of the safe deposit boxes if he determined after reviewing records that he wanted to do so.  *Id.* at 91:14-21.

### 2.     *Miami Herald* article

92.     Though the Tribe attempts to point to an article in the *Miami Herald* as an example of the IRS's improper purpose in issuing the summons, I do not find this

argument persuasive.[13]

93.     As a result of Agent Furnas's examination of the prior years, he found that allegations that the Tribe used armored vehicles to deliver up to $10 million in cash from its gambling operations to hundreds[14] of Tribe members four times a year were materially true.  *Id.* at 36:2-5.

94.     Though the focus of the IRS investigation is not whether cash arrived in armored vehicles or some other method, Agent Furnas confirmed that the examination that arose from these allegations is continuing.  *Id.* at 37:12-15.

95.     As Agent Furnas testified at the evidentiary hearing, he did not personally provide information to the *Miami Herald* or another news agency for the purpose of embarrassing the Tribe and tribal members, or for the purpose of creating publicity to force them into settling with the IRS in the prior case.  *Id.* at 39:14-19; 77:11-16.

96.     Agent Furnas did not individually provide an interview to the author of the *Miami Herald* article and it would be inappropriate within the IRS rules and regulations for an agent conducting an investigation to give an interview with a reporter about that investigation.  *Id.* at 40:9-15.

97.     In essence, nothing in the *Miami Herald* article derived from statements Agent Furnas directly told the press.  *Id.* at 40:16-18.

---

[13] As set forth at the evidentiary hearing, the article from the *Miami Herald* was not admitted as an exhibit and only marked for identification.  Tr. at 32:16-22.

[14] There are approximately 600 members of the Tribe.  Tr. at 94:21-23.

98.     In fact, Agent Furnas's manager instructed him that an individual from the *Miami Herald* may attempt to contact him because the individual had contacted the director of the Indian Tribal Government's Office, and that Agent Furnas should not disclose anything to the individual.  *Id.* at 40:25-41:4.

99.     Rather, the purpose of Agent Furnas's statement in Paragraph 4 of his Declaration with regard to the other case was because "it was important to lay out the reasons that [the IRS] commenced the examination."  *Id.* at 39:24-40:2.

100.    During his deposition, Agent Furnas described that he taught a class to the enforcement division of the National Indian Gaming Commission in which he discussed the *Miami Herald* article.  *Id.* at 41:14-20.

101.    The purpose of that class was not to discuss anything with regard to the Miccosukee examination, but rather, it was a general class regarding audit procedures. *Id.* at 41:24-42:2.

102.    To that end, Agent Furnas used a quote from the *Miami Herald* article in a PowerPoint presentation to explain the type of things the IRS may consider when examining issues surrounding tribes and credit cards.  *Id.* at 42:2-5.

103.    Insofar as there were allegations regarding the armored cars, Agent Furnas reiterated that the particular statement regarding the allegations was true.  *Id.* at 40:4-8 ("As a result of my examination, I found that the allegation was true in all material respects as it related to the determinations I needed to make in my examination.").

104.    Based on the above, I find that the IRS has established that it possesses a legitimate purpose in continuing its investigation with the summonses at issue and the Tribe has failed to demonstrate that there is an improper purpose underlying the issuance of the summonses.

**D.    Relevance**

105.    The Supreme Court set forth a distinction highlighting the "potential relevance" of information sought in a summons enforcement case as follows:

> As the language of § 7602 clearly indicates, an IRS summons is not to be judged by the relevance standards used in deciding whether to admit evidence in federal court.  *Cf.*  Fed. Rule Evid. 401.  The language "may be" reflects Congress' express intention to allow the IRS to obtain items of even *potential* relevance to an ongoing investigation, without reference to its admissibility.  The purpose of Congress is obvious: the Service can hardly be expected to know whether such data will in fact be relevant until they are procured and scrutinized.  As a tool of discovery, the § 7602 summons is critical to the investigative and enforcement functions of the IRS, *see United States v. Powell*, 379 U.S. 48, 57 (1964); the Service therefore should not be required to establish that the documents it seeks are actually relevant in any technical, evidentiary sense.

*United States v. Arthur Young & Co.*, 465 U.S. 805, 814 (1984) (emphasis in original).

106.    To determine whether the Tribe properly filed Form 945's and Form 1099's, the IRS must examine what payments the Tribe made, the amount of the payments, the payees, when payments were made, and the purpose of the payment.

107.    To determine the applicability of withholding requirements imposed on distributions from the Tribe's casino profits, the IRS must examine the source of funds for payments that the Tribe made.

108.   The summonses at issue request various records related to the Tribe's accounts which are potentially relevant to the IRS's investigation of whether the Tribe complied with withholding and reporting requirements because they help identify payments, payees, the nature of payments, and the source of the funds.  *See* Furnas Dec. ¶¶ 15, 25, 35, 45.

109.   Agent Furnas summoned all records of "securities transactions" because this information could be relevant to his determination of whether the Tribe had a withholding obligation in the event Tribal members may have requested that the Tribe invest their distributions in security accounts at Morgan Stanley and the "information in those accounts would then lead us to potential 1099 requirements."  Furnas Depo. at 85:15-16.

110.   Agent Furnas summoned all records of "any and all dividends and/or interest paid to the Miccosukee Tribe," because "distributions could have come from dividends or interest paid to the Tribe."  *Id.* at 85:20-86:17.

111.   According to Agent Furnas, this information relates to his determination of whether disbursements to Tribal members were made from gaming revenue, which would require withholding under IRC § 3402(r), and Agent Furnas admitted that withholding under IRC § 3402(r) would not apply to disbursements from interest income or dividend income.  *Id.* at 86:18-87:8.

112.   Agent Furnas summoned all records of "transactions for or communications with the Miccosukee Tribe" because he needs "to determine the nature, recipient, and source of any disbursements made by the Tribe. . . [and] [n]ot knowing what's in those records, [he] can't say if there is anything there that's relevant or not, but [the records] could include information regarding other financial institutions, other accounts of the Tribe that may have made disbursements." *Id.* at 88:13-20.

113.   Agent Furnas summoned "all loan documents" of the Tribe, including all "credit and/or background investigations, . . . loan correspondence files and internal bank memoranda" because he needs those documents "to determine the nature and source of the distributions. . . . [and] [i]f the distributions were made from loan proceeds, then that may be reflected in loan documents." *Id.* at 91:4-11.

114.   Agent Furnas summoned "all credit card records" of the Tribe because if the Tribe was allowing members to use the Tribe's credit cards for personal expenses then that would be a disbursement "that may certainly require 1099 reporting and may require withholding. . . . [and] [t]he application forms, the signature cards, if [he] found credit card expenses would . . . potentially tell [him] who had access and who was authorized to use those credit cards." *Id.* at 98:13-99:13.

115.   Agent Furnas testified that the source of funds is relevant to the ultimate determination on withholding because these records may show whether the funds "came from net gaming revenue and [are] subject to Internal Revenue Code Section 3402(r) withholding." *Id.* at 95:18-20.

116.   Certain exceptions arise where certain types of income may be distributed to tribal members without such distributions being taxable or creating a 1099 requirement, although Agent Furnas did not know of any such exceptions in this case. Tr. at 54:7-11.

117.   Agent Furnas requested documents he believed may relate to payments that would be taxable either to members or to third parties and would therefore require a form 1099, in addition to documents that would shed light on the nature and the source of any distributions he may find because that also is relevant to the determinations he must make.  *Id.* at 54:21-55:2.

118.   Though this section deals with the third prong of the *Powell* analysis, relevance, I briefly discuss the Tribe's argument that the summonses are overbroad since I have outlined the specific materials sought in this section and as set forth *supra* § I.A.ii, recognizing that these are two separate analyses.

119.   An IRS summons is overbroad if it "does not advise the summoned party what is required of him with sufficient specificity to permit him to respond adequately to the summons."  *United States v. Medlin*, 986 F.2d 463, 467 (11th Cir. 1993) (quoting *United States v. Wyatt*, 637 F.2d 293, 302 n. 16 (5th Cir. 1981)).

120.   The summonses specify the detailed subject matter of the documents and materials requested, the source of those documents, and the limited three-year time period from which the documents are to be drawn.

121.   The summonses seek records from a finite period, the years 2006 through 2009.

122.    The summonses specify exactly what materials are requested from the third-party recordkeepers.

123.    Based on the above, I find that the requested materials and documents in the summonses are relevant to the purpose of the IRS's inquiry in determining whether the Tribe made necessary and proper withholding and reporting requirements and I also determine that the summonses are not overbroad.

E.    **Possession of information**

124.    Agent Furnas testified at the evidentiary hearing that he reviewed the administrative summons to determine whether some of the requested records are already in the IRS's possession.  Tr. at 43:12-18.

125.    Agent Furnas's declaration sets forth that the IRS does not possess the summoned information.  Furnas Dec. ¶¶ 16, 26, 36, 46.

126.    On or about September 2006, the Tribe provided Agent Furnas with an incomplete check register showing that checks were issued to tribal members on the distributions.  Tr. at 30:14-31:7.

127.    Agent Furnas reviewed bank deposit records including bank checks issued and cashed by the Tribe to determine that the vast majority of these checks were cashed on the spot at distribution and most of tribal members received cash.  *Id.* at 31:9-19; 31:22-25.

### i.     Form 1099s issued by Morgan Stanley

128.   Though the IRS already has the Form 1099s issued by Morgan Stanley to the Tribe, Agent Furnas left that material in the summons because the IRS learned through prior investigations that the Tribe maintains hundreds of accounts held in the names of members, but owned by the Tribe, and there are questions regarding ownership of the accounts.  *Id.* at 43:19-44:18.

129.   Further, though Agent Furnas is not aware of any actual trust accounts, the possibility that those accounts exist compelled Agent Furnas to leave the request for 1099 forms issued by Morgan Stanley in the summons.  *Id.* at 44:20-21.

130.   For example, if there were any 1099 forms filed on trust accounts, it would indicate to Agent Furnas that those accounts were probably not owned by the Tribe and the IRS may not have realized that a 1099 form was filed with regard to a tribal account. *Id.* at 44:21-45:1.

### ii.     Account executive worksheets

131.   The IRS in its summons seeks the Tribe's account executive worksheets from Morgan Stanley, which are worksheets by a broker that may shed light on financial transactions in investment type accounts.  *Id.* at 45:18-46:5.

132.   Those worksheets may contain information which would lead to details regarding disbursements or the nature, source, and recipient of the disbursements.  *Id.* at 46:12-15.

133.   Agent Furnas acknowledged that he has not seen worksheets with regard to the earlier matter or in other tribal cases.  *Id.* at 46:17-21.

134.   Agent Furnas also conceded that he does not know that the account executive worksheets even exist, but information in those sheets could shed light on the nature or source of disbursements due to, *inter alia*, the broker's advice to the Tribe on how to invest funds held on behalf of members. *Id.* at 46:17-47:15.

135.   The summons also requests all loan documents, credit background investigations, loan correspondence files, and internal bank memoranda even though Agent Furnas did not find in his audits any indication that the Tribe entered into transactions involving loans that would be a method of making distributions that would require withholding or 1099 forms. *Id.* at 48:1-8.

136.   Agent Furnas conceded that with respect to the withholding issue, particularly the backup withholding, the records in the summons would "probably not" indicate whether the Tribe had the Social Security numbers of tribal members before it made payments to them. *Id.* at 48:13-18.

137.   Generally, if the Tribe did have Social Security numbers of tribal members before it made payments to them, no backup withholding on those payments would be necessary. *Id.* at 48:19-22; Furnas Depo. at 29:12-19; 32:8-33:1.

138.   Agent Furnas explained that even if the IRS possessed the Social Security numbers, it would not make a difference to requiring the information as it relates to the current summons because the 1099 forms would nevertheless be required and to the extent amounts came from gaming revenues, there would be withholding regardless of whether the Tribe obtained the tax identification numbers. Tr. at 50:22-51:6.

139.   In consideration of all the evidence, I determine that the IRS is not in possession of all the materials requested through the summonses and has met this factor of the *Powell* analysis.

**F.   Administrative steps**

140.   Whether the IRS has satisfied fourth prong of the *Powell* test, if the administrative steps required by the Code have been followed, is not in dispute.

141.   The IRS served properly attested copies of each summons on the relevant bank and the Tribe.  Furnas Dec. ¶¶ 9-10, 19-20, 29-30, 39-40.

142.   The IRS also took all administrative steps required by the Internal Revenue Code, and there is no referral to the Justice Department as defined in Section §7602(d) of the Internal Revenue Code with respect to the Tribe for the years 2006 to 2009.  *Id.*  ¶¶ 8, 18, 28, 38, 48.

143.   In accordance with 26 U.S.C. §§ 7603 and 7609, Agent Furnas served a copy of the summonses on the Tribe on September 10, 2010, by mailing copies, via certified mail.  *Id.*  ¶¶ 10, 20, 30, 40.

144.   During the investigation of the taxable periods from 2000 to 2005, Agent Furnas obtained third-party records through the issuance of an administrative summons which was unopposed.  Tr. at 9:5-11.

**III.   Conclusion**

145.   The Government has met all four *Powell* factors in demonstrating that its administrative summonses issued pursuant to Section 7602(a) of the Internal Revenue Code may be enforced.

146.   The Tribe has not met its heavy burden of refuting the United States' showing or demonstrating that enforcement would be an abuse of the Court's process.

147.   The evidence presented demonstrates that the IRS essentially has no information, whether through documents or otherwise, pertaining to the Tribe's withholding and reporting requirements for the years 2006 through 2009.

148.   Though the Tribe claims these are private tribal records, the descriptions in the summonses seek records of financial institutions that are held in the custody and control of third-party recordkeepers.

149.   Accordingly, even if tribal sovereign immunity applied to the instant set of facts, it is not clear that this is a suit against the Tribe seeking Tribal records and—as set forth clearly in my prior order—the Eleventh Circuit in *Fla. Paraplegic* determined that tribal sovereign immunity cannot be invoked "to prevent the federal government from exercising its superior sovereign powers."

Based on the foregoing, it is hereby ORDERED AND ADJUDGED that:

1.   Respondent United States' Motion to Deny Petitions to Quash **[ECF No. 16]** is GRANTED.

2.   The Petitions to Quash the Summonses issued to Morgan Stanley **[ECF No. 1]**, Citibank **[Case No. 10-23508; ECF No. 1]**, American Express **[Case No. 10-23509; ECF No. 1]** and Wachovia **[Case No. 10-23511; ECF No. 1]** are DENIED.

3.   Case Nos. 10-23507 is CLOSED.

4.   Case Nos. 10-23508, 10-23509, and 10-23511 shall remain CLOSED.

5.     All pending motions are DENIED and all upcoming hearings are CANCELLED in

Case Nos. 10-23507, 10-23508, 10-23509, and 10-23511.

DONE AND ORDERED in Chambers at Miami, Florida, this 2nd day of August,

2011.

_____

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:    U.S. Magistrate Judge Jonathan Goodman
       Counsel of record